Case number 245549 Thomas Smith et al. v. PAM Transport Inc. Argument not to exceed 10 minutes for plaintiff, 5 minutes for amicus, and 15 minutes for defendant. Mr. Janney, you may proceed. Good afternoon, your honors. May it please the court. My name is Doug Janney. I'm here for the appellants, Thomas Michael Smith and Montalito Sneed. I'd like to reserve three minutes for rebuttal, and I've only got 10 minutes because the EEOC is going to be arguing for five minutes, so this will be a seven-minute session followed by five, followed by three, if it pleases the court. We respectfully request that the court reverse the judgment of the district court and hold that plaintiffs presented evidence from which a reasonable jury could find that they were subjected to a racially hostile work environment for two reasons. One, a reasonable jury could find that the harassment was based on race. Why? Number one, the supervisors directed racial slurs and racial comments at both plaintiffs directly to the plaintiffs. They didn't hear it secondhand. It was directed directly at the plaintiffs by not one but two supervisors. Secondly, these racial comments were accompanied by threats to their threats of discipline, threats of discharge, threats of not getting paid, threats to their continued employment. I have a question that arises from the briefing. The defendant's briefing argues that plaintiffs testified to only one use of the complaint of words. Is that correct on this record? That is incorrect, Your Honor. That is viewing the record in the light most favorable to the defendant. Viewing the record in the light most favorable to the plaintiffs, they're referring only to one of the plaintiffs as well. That's Plaintiff Sneed. They say that he said that the monkey term was used only one time to him, but that was Mr. Sneed giving an example. When he said one time, it was one time, comma, Davis said to me, get your monkey ass out there and do the job or I'm going to write you up. So that is absolutely not correct. Both plaintiffs testified that it was repeated, and there's evidence in the record from which a reasonable jury could infer that it was repeated conduct, Your Honors, and that is that perhaps our strongest point in this case is that both plaintiffs repeatedly, exhaustively complained to members of management about the racially discriminatory comments, the abusive, the cussing, the threats, the belittling, also about the discriminatory treatment, the repeated acts of discriminatory treatment that contributed to the hostile work environment. Mr. Smith repeatedly complained to James Brown, former Driver Liaison Manager James Brown. He said under five times about the racial comments, but still more than two times, and he said more than ten times about the discriminatory work assignments and the responses that he got when he complained about the discriminatory work assignments. So the fact that both plaintiffs repeatedly complained to multiple members of management throughout the course of their employment is evidence from which a jury could find that the conduct was repeated. In addition to the racial slurs, the threats, the cussing and screaming, abusive, intimidating behavior, plaintiffs were assigned longer and more routes. Mr. Sneed testified that they spent time on the yard talking with the other drivers out there at the Whites Creek Yard, and he observed and discussed that white drivers, non-African American drivers, had one route to Horse Cave, Kentucky, while he had multiple routes in a single day to Horse Cave, Kentucky. Mr. Smith testified that the routes we were assigned, we being African American drivers, were, quote, way longer than the routes that the non-African American drivers received, and that he, moreover, that he complained about this repeatedly to management. And both plaintiffs' testimony was that despite their complaints, nothing was ever done about this. Is the age of the truck an issue here? They talk about older trucks. Is that an issue, or does the documentary evidence resolve that against your comment? I think they're talking more about damaged trucks, but Defendant did produce a chart that doesn't, it's not really labeled Whites Creek Yard or anything that really gives us a lot of information, but they did produce a document that says that the trucks were all 2017 to 2019, so I don't think the age of the trucks is an issue. But the discriminatory routes is the main thing here, and the fact that that resulted in plaintiffs receiving less pay per hour, because Mr. Sneed and Mr. Smith both said, hey, we've got 10- and 12-hour workdays here. These guys have got four- and five-hour workdays, and then they're getting in their personal vehicles and going home, and they're all getting the same $180 per day amount of pay. So if one worker's working so many more hours and another's working so many fewer, then that results in less pay. But really it's the response. When Mr. Smith testified that he complained about these routes, he was told, you get what you get. That's just how it is, and if you don't like it, maybe you should find another job. That's not an appropriate response, and it contributed to the hostile work environment in which the plaintiffs were immersed. There's two allegedly offensive, however you want to say it, phrases used. Do you think there's any difference between the two? Are they equally suggestive of race? Your Honor, I think they're equally suggestive. You're correct, though. It's not just one. The testimony from Sneed was, Claytor used Monkey like Davis, period. So that's one, Monkey. And then he goes on to say, Monkey ass, they, Davis and Claytor, they used that. That's page identification number 665. It was accompanied by threats. Get your monkey ass out of here or I'm going to write you up, page identification number 663. But, Your Honor, there's not a difference, really. It's like there was a case that this Court decided on March 5, 2025, a couple days ago. It's Jones v. Fleur, F-L-U-O-R. It's an unreported decision, but they talk about how calling an adult African-American male a boy is racially discriminatory and offensive. The same thing can be said about Monkey and Monkey ass. Does it matter who the speaker is? In other words, there's two individuals who are referred to as supervisors. I actually have a question about that. But one's the same race, one's not. You're correct, Your Honor. Davis is African-American, Claytor was Caucasian, and it doesn't matter. Title VII, the EEOC guidance and case law cited in our brief says that it doesn't matter. A person of the same race can discriminate. Maybe it's equally likely, maybe it's less likely. It doesn't matter at all. In other words, there has to be a severe or pervasive harassment. Yes. Does it matter who the race of the speaker is? In other words, there's ways in culture where some people use phrases in different ways or some races use phrases in different ways and they might have different connotations, and I don't really want to get into all that, but does it matter at all to you the race of the speaker? Not in this case. The intent or the motive or the connotation? It could, Your Honor. I'll concede that. But not in the context of this case where you've got truck drivers and a dispatcher, Davis, who's African-American, calling plaintiffs monkeys and monkey ass and mistreating them, cussing, screaming, abusing them, assigning them longer routes, ignoring their complaints. I don't think in this case that it matters because the law is well settled that a person, an African-American supervisor, can discriminate and harass an African-American. Yeah. In some cases, Your Honor, it could make a difference, but I think in the context of this case, I don't think it does. I think that both plaintiffs testified they were offended by these comments and the mistreatment and the harassment, and it appears I'm out of time. I have one more question.  What is your best argument that PAM cannot avail itself of the Faringer-Ellert? Is it Ellert? Faringer-Ellert. Yes. Affirmative defense. Your Honor, a couple things. Plaintiffs were subjected to tangible adverse employment actions here. Mr. Sneed was discharged, the ultimate adverse employment action, and Mr. Smith was constructively discharged. He testified that the working conditions became unbearable and intolerable after his repeated complaints fell on deaf ears. He complained more than ten times about the discriminatory working conditions and about the monkey comments and the other harassment, the cussing, and nothing was ever done was his testimony. And so that's the best argument, I think, is that the Faringer-Ellert defense doesn't apply because the plaintiffs suffered tangible adverse employment actions. Even if it did apply, the defendant can't satisfy either element of the Faringer defense. They can't show that their policies were effective in practice because their policy said that the plaintiffs could complain to any manager who they both testified, they complained to management, and nothing was done. The defendant admitted it didn't do any investigation. The plaintiffs said nothing ever happened, so they can't satisfy the Faringer-Ellert affirmative defense. Can I ask you a related question? You have to show that Pam is responsible, right, for the conduct of the two employees we're talking about? Well, if it's racial harassment by a supervisor, Your Honor, Pam can be held directly. Okay, so did the district court find that they were supervisors? The district court, I don't think it addressed whether they were supervisors. I don't think it did either. Even if we agreed with you on other issues, don't we have to send it back to the district court to determine whether these are supervisors? I don't think on this record, Your Honor, because Pam's designated Rule 30b-6 corporate representative testified that driver liaisons had authority to terminate drivers like plaintiffs. In fact, Tyrone Luckett, a driver liaison, terminated Snead. Because they had authority to terminate, they were supervisors. The district court didn't make that finding. Usually, we're a court of law, but less a court that makes factual findings. We don't have a conclusion from the district court on that. We have something of a record. I think the district court assumed, Your Honor, that they were supervisors in light of all the record evidence that Claytor and Davis controlled plaintiff's work assignments. They were the ones that assigned these routes about which we complain. They were people in the— Let me just ask you, my notes are that Davis, as a driver manager, I understand there's some questions there, but tell me if I'm wrong. I have the note that Claytor was Davis's superior and that his title was operations manager. Am I wrong? You're right on, Your Honor. That's exactly right. Claytor is one to whom Snead testified that he complained and opposed. One of several upper-level managers that Snead testified that he complained to by cell phone and in person and otherwise. The definition of supervisor is a legal concept, right? They have to have certain responsibilities and rights. I think we at least agree the district court didn't make an express finding on this. Did not make an express finding on the issue, Your Honor. To your point about the legal term, if the supervisor has to have authority to control the terms and conditions of the plaintiff's employment, and here driver liaisons did just that, and in fact one of these driver liaisons, Tyrone Luckett, fired Mr. Snead. My time is up. If the court has any other questions, I'd be happy to answer. No, thank you. You'll have your rebuttal. Thank you, Your Honor. Good afternoon, and may it please the court. Tara Patel for the EEOC. We ask this court to correct four fundamental errors. I have a special question before we get to this. So the brief, I assume, when it was filed was authorized by Ms. Gilbride, who was the general counsel of the EEOC. She's no longer the general counsel of the EEOC.   That's correct, but this brief was voted on by a unanimous bipartisan commission with a quorum. In the last presidential administration. That's right, but the EEOC has the ability to continue with it. There's a new acting general counsel. Is that general counsel approved this briefing? The new acting general counsel is on the most recent filings, including the motion to argue in front of this court. So we have your assertion that the new general counsel approves of this brief? Yes, Your Honor, and the acting chair also approved of this brief before the administration changed as well. Thanks. We ask this court to correct four fundamental errors by the district court and reverse this grant of summary judgment on plaintiff's hostile work environment claim. First, a reasonable jury could find that calling an African American employee monkey ass is harassment based on race. And second, a reasonable jury could also find that even limited use of the slur by direct supervisors, squarely targeted at plaintiffs, and in combination with abuse and other threats of harassment could constitute severe or pervasive harassment. Third, the district court was wrong to exclude as a matter of law, all employment related actions under the hostile work environment analysis. And fourth, the district court was wrong to reject plaintiff's identification of white comparators. I'd like to jump straight to the severe or pervasive analysis. Just a question I asked your colleague. Does the race of the speaker matter at all? I mean, these are racially charged comments. Is the race of the speaker relevant? It's well set a law that Title VII can be violated by members of the same race. I know it can be, I know it can be, but it's not always. And is that a factor that is relevant that we should consider? I think that is a factor that can be taken into context and into jury specific. It's a factual intensive analysis and a jury could consider that at trial. So what would the jury consider here? Well, here we have the use of the term monkey ass being used directly by supervisors, one black and one white. They're squarely directed at plaintiffs and it's used in a hostile way. It's coupled with abuse, threats of termination, or no pay. This court in Schlosser held that threats of termination are serious when paired with other offensive conduct. This court in Johnson v. UPS emphasized that the severity of a slur greatly increases when used by a manager and when directed at plaintiffs. Were those managers that were the same race or different race than the subjective employee? In those cases, I believe there were of different races, but the holding doesn't differentiate. I'm not saying you're wrong. It's a unique fact about this case. Is there a good case? I was having trouble finding. I found the cases that say that it can be harassment and I'm not disputing that. But are there cases that really take this on or look at what factors we should consider when you have the atypical situation where it's people of the same race, maybe people of the same gender, or making disparaging comments? There are a few cases on point. One is on call. That's same-sex harassment. The court found that there could still be same-sex harassment even though the members were the same sex as the victim. I agree with you. Although the allegation was that the employee was exhibiting characteristics of a different gender, so it's not quite apples to apples. But are there any circuit cases that have really taken this on? The court in Gallagher pinpointed what the inquiry is, and the court in Gallagher said that when harassment is patently degrading of a certain group, the harasser's motive and the potential exposure of others outside the protected group are relevant, and I think that speaks directly to the question of whether it focuses the inquiry on the impact of the individual being discriminated against. And here where you have the use of the slur, monkey ass, used by a direct supervisor, the supervisor is responsible for this discipline, responsible for their daily work assignments, and is threatening them at the same time with no pay or with no termination, cussing and yelling and belittling and berating them. That's enough for a jury to find could amount to a severe or pervasive hostile work environment. And I see my time is up. I had a question about what is the best case you would cite us to regarding the recognition that the use of the word monkey or monkey ass face-to-face with an employee is a direct racial slur? Sure, Your Honor. There are two cases, if I may. One, U.S. v. Jones says that it is a reasonable, perhaps even obvious, conclusion that the reference to monkeys is intended as racial insult given the history of racial stereotypes against African-Americans and the prevalent one of African-Americans as animals or monkeys. And as to the point about directed squarely at plaintiff, I would point this court to Johnson v. UPS. Are you aware of any court precedent here or elsewhere that would require a plaintiff to provide some additional evidence of a comparator's race beyond the plaintiff's personal perception or experience? I mean, is there any case to – the district courts seem to have suggested that that would be required in some way. No, Your Honor. I don't think there's anything else in any case that requires that a plaintiff proffer evidence beyond their own perception, particularly when the issue is not in dispute. Thank you for your argument. Thank you. And your co-counsel will have rebuttal. Good afternoon, Your Honors. Autumn Gentry representing PAM Transport in this case. I'm sorry I'm recovering from an upper respiratory thing, so I think I can get through this. Can I ask you about the supervisory issue? I'm sorry, go ahead. You can bring a glass of water if you would like. I just wanted to touch upon the supervisory aspect of things. Smith and Snead served under the supervision of Jerome Davis. Jermaine Davis, yes, Your Honor. And then Jermaine Davis reported to Jordan Claytor. That's my understanding. So Claytor would be Davis' supervisor? Correct. Okay, and Davis would supervise Smith and Snead, or at least they reported to him in some fashion.  He was their driver manager. He assigned their routes and the number of loads, the routes, the distance of the routes, et cetera. Okay, thanks. But going to your point, Your Honor, about whether it matters who says the slur, I think it does very much matter. In this particular case, we've got Judge Radler, we've got Snead saying over and over and over, I complained on Qualcomm messages and the Qualcomm devices in the trucks that records electronic communications between, sort of like text messaging, but it's a different device that sits in the truck, and the driver can communicate with their dispatcher. We produced over 36,000 lines of Excel spreadsheets of communications between Snead and Davis and Claytor. There is not one slur mentioned. The term monkey is not used. The term monkey ass is not used. There is no discriminatory conduct whatsoever in these messages, and there is also, more importantly, no instances where Snead ever complains. Now, Mr. Snead did say in his deposition that he sometimes would use the phone with Mr. Claytor, but most of his communications were on Qualcomm. Did he also testify that Davis directly spoke to him? You mean on the phone? No, I mean directly spoke to him. There's communications on Qualcomm. Yes, that's when they're on the trip, right?  Oh, you mean in person? There's the manager. He's telling him what your routes are today. He's telling him where he's got to go, once to Horse Cave, twice to Horse Cave, whatever it is. Isn't the testimony in this record that Davis directly spoke face-to-face to this employee and used this language? My understanding is that is not the case, Your Honor. I believe Mr. Snead testified that all his communications were with Davis. Well, I know that he testified this. All his communications with Davis were through the Qualcomm. That's how he received his assignments, how every other driver received their assignments and routes. It's not like they went to a facility and had a meeting. They would just get in their truck and they would look at their Qualcomm messages. In fact, when I asked Mr. Snead and Mr. Smith what race Mr. Davis was, they did not know. So your position is there is no, the direct speaking all had to do either with the Qualcomm or the references to telephone calls? Correct, Your Honor. And as the district court noted, plaintiffs do say, well, we believe that these Qualcomm records are incomplete. They're indecipherable. We could read them. It didn't seem like it was a challenge to read the messages, but they, plaintiffs do claim that they're incomplete. But as the magistrate judge and also the district judge noted, there's absolutely zero evidence that there's anything missing in these Qualcomm records. Mr. Smith testified that he did not use Qualcomm, that he used his phone. He testified that he complained to a former driver liaison about his complaints of discrimination. Unfortunately, that former driver liaison has passed away. But I'm disputing what plaintiffs said. I understand their argument is that all driver liaisons had supervisor authority, and that is simply not the case. In fact, I believe it's Mr. Brown that was the driver liaison that Mr. Smith felt close enough to talk to, our 30B6 witness testified that he did not have any supervisory authority. I just want to be clear in looking at the depositions of Smith and Sneed. I thought that Smith testified that when he and Davis spoke, Davis would, quote, use the term monkey ass, and then Sneed testified that Davis told him to, quote, get his monkey ass out there and do the job, unquote, and that Claytor, like Davis, also used the term monkey ass when they communicated. Is that, that's the testimony from Smith and Sneed. Does that involve Qualcomm, or that seems to just involve Smith and Sneed's understanding of, like, conversations that they had directly with Davis and Claytor. Am I wrong about that? It's my understanding, if I'm answering correctly, it's my understanding that Mr. Smith testified that he did not use Qualcomm. He used his phone. So this, okay, so this was Mr. Smith's testimony about his conversations with Davis. Yes, and with Davis they were also by phone. He did not, he indicated that he did not use. Does that make a difference if they're by phone? I don't, I don't believe it. Okay, I'm just wondering, is it? No, I don't believe it does. I have a note that Smith testified that he also spoke in person. Are you telling me that the record with these two, Davis and or Claytor, are you telling me that the record contains no evidence that there was an in-person, there were in-person discussions between either of these employees and either Davis or Claytor? There were not any in-person communications between the plaintiffs and Mr. Davis for certain. I believe Mr. Smith testified that he had in-person meetings with Mr. Brown, the former driver liaison. I do not recall one way or the other about Claytor, whether he had met, actually met Mr. Claytor or not in person. But going back to the terms, excuse me, Judge Reitler, you had asked about if there were two slurs. And, Your Honor, I would assert that there are not. There are just one. Now, Mr. Smith did say in his deposition, and he was in Mr. Sneed's deposition, who was deposed first. Mr. Sneed testified that he was called monkey-ass by Davis, his African-American dispatcher, as well as Mr. Claytor, who is Caucasian. But then when I asked Smith about this, Smith said, well, yeah, and he was, I know this is not in the record, but he was sheepish about saying a slur out loud in a court proceeding. And he said, well, he used monkey like Sneed. To me, that indicated the same way that it was used with Sneed. There is absolutely nothing in the record to suggest that they were called monkey and monkey-ass. Every instance in the record, except for that one where he says I was called monkey like Sneed, was to the term monkey-ass. There's absolutely no case law. There's nothing cited by the plaintiffs indicating that this is a racial slur. Help me understand that. You're saying that what the EEOC has just told us, referencing Jones and Johnson versus UPS, that there is case law that directly states that to call an African-American a monkey or a monkey-ass is a racial slur. I do not. I'm sorry, I heard her say monkey. I did not hear the term monkey-ass when she was arguing. Let's say both. Are you telling me there is no case law that says that calling an African-American monkey or monkey-ass is, in fact, a racial slur? And you said monkey-ass, correct? Both. Oh, monkey, absolutely. But there's also case law that says, using the term monkey, it does not constitute a hostile work environment or does not constitute discrimination. It's not so severe or pervasive to alter the working conditions of the employment. Doesn't that depend on the pervasiveness and the severity of it? Sure. There are cases that go both ways. Correct. So you concede that calling an African-American a monkey is a racial slur? Yes. But going to Judge Radler's point, I do believe it depends on who the speaker is. And what is your support in that position? I don't have any. In case law. I don't have any case law to that effect. Thank you. And Judge Strench, going back to your, you asked about also the term monkey-ass, whether there was any case law that specifically uses the term monkey-ass. I am not familiar with the two cases Ms. Patel cited, so I can't speak to those. But I have researched that many times and found zero instances where the term monkey-ass was used. So I have not found any case law saying one way or the other whether this is a racial slur or anything to that effect. But plaintiffs don't, they don't cite anything to say that this is a racial slur or that, you know, they do use a lot of the case law that refers to just the term monkey. I believe they're conflating the two. They're trying to lean on one for support for the other. So if both were used, then both are in the record, right? Right. What was said is in the record, and I do not believe that they were both used. Okay, so let's, so then we can assume that you do agree that monkey was used. No. I believe monkey-ass was used. That's what the record, I mean, Mr. Smith testified in his, Mr. Sneed testified numerous times about the term monkey-ass. Mr. Smith was then deposed. He sat in on Mr. Sneed's deposition. He also testified about monkey-ass. But then he said, I was called monkey like Mr. Sneed. But Mr. Sneed never said monkey. He said monkey-ass in his testimony. So is your point that there are cases on monkey but not on cases on the other term? Yes, Your Honor. And you can't transfer the one to the other? That is correct. What, what, what, I had two questions. But one would be what, why, why, why is, why, what differentiates those terms? I don't think we can automatically say that using the term, understanding, understanding that there are cases that say the term monkey when referring to an African-American is a slur. And the word ass somehow cleanses it? I don't know if the word cleanses is right, but I don't know that it has the exact same connotation. This is nowhere in the record, and I certainly wasn't going to cite to it in my brief. But the only reference I found to the term monkey-ass was in Urban Dictionary, and it did not indicate a race associated with it. But I certainly was not going to put that in a brief citing to the Urban Dictionary. But the other, the other question, but in this case, the record shows that there were white employees who were not, this term was not, to whom this term was not used. If it was just two employees, this term was being used, that might be one case. But in this case, isn't the record that there were a whole bunch of other employees that were white and were not being called monkey-ass? I believe the testimony, Your Honor, is that the plaintiffs did not show that other, that non-African-Americans were called that either. There was no testimony one way or the other whether non-African-Americans were, the same slur was used with them. I thought there was, there were numbers of citations in the record that, to testimony of these two gentlemen, that the other employees were not treated the same way as they were. That they were cussed at, that they were called monkeys and monkey-ass, and that the white drivers did not receive the same treatment. I believe. Your position that that's not in the record? I believe that's correct, Your Honor, as far as what plaintiffs testified to, as far as the tone that was used with them and the yelling and the belittling. I don't believe that the testimony reflects that that also applied to the term monkey-ass. But I do recall there were instances where, I believe it was Mr. Smith said, you know, whenever I would overhear Mr. Davis speaking with another, which I see now is why you're asking if they were in person. Because I'm now, I'm drawing the conclusion how could he hear any communications with another employee unless that employee was on the phone or on speaker phone or something to that effect. Or in person. But the White Creek's station was not staffed is what I recall. I believe it was just like a small trailer. Like there wasn't, the dispatcher wasn't there. The dispatcher lived, was in Memphis. And Mr. Claytor, I believe, was in Arkansas. But they were, neither one of them staffed the White's Creek location. At this juncture in the case, isn't the record to be viewed in the light most favorable to the plaintiff? It is, Your Honor. And I believe even when you do that and the district court did that, there's just no, plaintiffs have presented no evidence that their treatment was based on race or that it was so severe or pervasive to change the working conditions of the employment. The district court took a very narrow view of how race can be depicted or understood, actually imposing, in my estimation, a heightened standard on the plaintiffs. What, I saw no citations in that part of the decision. What, do you take the position that that is the correct case at law? And if you do, what do you rely on? I, you're correct. The district court did not, there are no citations other than the news articles, but there's no legal citation to support that finding. And I have not found any case law indicating, addressing that one way or the other. However, I believe that even outside that finding, you know, even if you discount that finding, there is still, plaintiffs have shown insufficient evidence to, you know, overcome summary judgment. Thank you. Can I ask one question? Sure. The supervisor point I was asking your friend on the other side about, are you contesting that these are, that the two employees were supervisors as a legal matter? We haven't. I don't see why we would do that now, but that has not been anything that. Probably won't either. All right. Gave me something to think about though, but no. We're here for it. That was not something that we had an issue over. Rebuttal. May it please the court. Judge Riedler, when the EEOC was telling you about the Onkali decision by the Supreme Court, that brought to my mind there's a decision in the Sixth Circuit, Your Honor, asked about if it's the same protected class, Smith v. Rock 10, that's 813 F. 3rd 298, Sixth Circuit 2016. That's a same sex harassment reported decision by this court. A hostile work environment, same sex harassment. It wasn't race, but it's the same sex. That would apply, I think, to this case, but this is a race case. I just wanted to provide that case to Your Honor. Then, Judge Cole, you mentioned that the district court went on and on about evidence beyond the plaintiff's perception, that plaintiffs are required to produce more than their own observations about, quote, unquote, white drivers, quote, unquote, non-African American drivers. Judge Stranch, you suggested the district court stuck us with a heightened standard with no citations to case law, and that's exactly right. Your Honor, this decision cannot stand on those points. The district court went on and on and on about how plaintiff's perceptions of their comparators is not enough to defeat summary judgment. That just can't be right. A plaintiff has to be able to testify that a white driver is treated differently than he or she, and that's got to be enough for purposes of summary judgment. That can't stand. Also, the things about plaintiffs have no personal knowledge. Plaintiffs testified based on their own observations and their own discussions, not only with other drivers, but with supervisors, testified about their complaints to supervisors and managers, and those managers' responses to them. Federal Rule of Evidence 801-D2, that would come in under Johnson v. UPS. Regarding driver liaisons not having authority to terminate, page ID number 851, Defendants Rule 30b-6, corporate designee Holly Wright, their HR director, testified that driver liaisons have authority to terminate drivers, and that, in fact, happened. Your friend on the other side sort of conceded the point, I think. I just wanted to make sure, Your Honor. Hammer to home. Monkey and monkey ass, construing the record in the light most favorable to the plaintiffs, as is required here, Sneed's testimony at page ID number 665, Claytor used monkey, comma, like Davis, period. Monkey, not monkey ass. He used monkey, comma, like Davis, period. Then he goes on to say monkey ass, they used that. So that's two terms. So construing the record in the light most favorable to the plaintiffs, it's both, but I agree with what I think you were saying, Judge Raisler, it doesn't really matter. The terms are kind of interchangeable, but our position is, viewing the record in the light most favorable to the plaintiffs, both terms were used in this case, and there's evidence in the record to support that. Regarding Judge Stranch, you mentioned, were these complaints and comments and harassment all over the Qualcomm? They were done orally by phone and in person. Sneed's page identification numbers, it's a little bit long, but it's 617- Go ahead, put it in the record. Okay. It'll be easier for all of us. You won't have to send a follow-up. 617 through 623, 626, 627, 629, 651, 652, 684, and 687. We had cited that where Sneed had talked about orally by phone and in person, and setting the Qualcomm aside. Now, with regard to the Qualcomm, I see my time's up. May I address briefly the Qualcomm? Your Honors, we had two discovery disputes over these Qualcomm messages, and defendant's first position was, we don't have them anymore. We don't maintain them. After six months, they're all gone. Plaintiff's deposition was two years after they were terminated, roughly 22 months. Their position in our first discovery dispute was, we don't have them. You'll have to subpoena them from Omnitrax. The magistrate judge was on that, too, saying subpoena them. We eventually subpoenaed them from Omnitrax. There's in the record emails between me and Omnitrax's general counsel saying, we don't have them anymore. We don't have any records or data to produce. Subsequently, after all briefing was done on summary judgment, they emailed defense counsel and me a sworn declaration saying, we don't have any records. These records, defendant characterized what they had as gibberish. That's defendant's word, that these Qualcomm records are gibberish. And if you look at page identification numbers 267, 274, and 277, you see a lot of characters and gibberish in these messages. They're shorter than text messages, Your Honors. They're not even like a text message. You have to hunt and peck on the screen in your truck. You have to hunt and peck to type out a very cryptic short message. But even then, Snead on those three pages I cited complained about extra stops he had to make. Last time I took a load, it wasn't a good experience. I barely made it back on time. This is not right. I had less than four hours on my clock. I need to talk. So I didn't see complaints about the discrimination in the Qualcomm messages, but he did complain about the discriminatory routes and saying, hey, you're running my clock out on me, and I can't complete these routes. But there's no question that both plaintiffs testified that they received these complaints orally by the phone and in person, and they complained about them orally by phone and in person. And then lastly, Your Honors asked about a case on the monkey term. There's a case, it's Woods. Woods, it's 29F4285, Fifth Circuit, 2022. This is where a supervisor directly called the plaintiff a lazy monkey, A-N, and the court held that's similarly odious to a use of the N word. So that's a case on the point about using derivatives of the term monkey, and I had another case, it's Banks v. General Motors, 81F4242, page 266, Second Circuit, 2023. Use of monkey or derivative terms in the workplace is compelling evidence of a racially hostile work environment. We thank you all for all your work on this case, for your briefing, for your argument, for the EEOC's participation. The case will be taken under advisement and an opinion issued in due course.